[No. 18173. Department Two. December 21, 1923.]

## J. P. DUKE, as Supervisor of Banking etc., Appellant, v. DEAN JOHNSON, Respondent.[1]

PRINCIPAL AND AGENT (43)—AUTHORITY OF AGENT—EVIDENCE—
SUFFICIENCY. The authority of the president of a bank to direct the
amount of a cashier's check to be charged to the account of a de-
positor, from whom he had a general power of attorney, is sustained
where it appears that he had freely exercised the right, without
question, to draw checks upon and direct charges against the ac-
count, and the only denial is the ex parte statement of the de-
positor, who refused to submit to cross-examination.

SAME (42). In such a case, it is immaterial that the bank held
the obligation of the depositor in excess of the account, where the
right of set-off was not exercised and the bank was solvent and
recognized the account as a checking account.

BANKS AND BANKING (20, 23)—DEPOSITS—PAYMENT OF CHECKS—
FRAUD—EVIDENCE. A cashier's check, charged by the president of
the bank to the account of a depositor, under a general authority
to make such charge, is not void, in the hands of the purchaser of
the check, because it was the payment of the private debt of the
president from the funds of the bank, nor is it material that it was
not immediately charged to the account, in the absence of any evi-
dence of fraud.

Appeal from a judgment of the superior court for
Pierce county, Clifford, J., entered November 24, 1922,
upon findings in favor of the defendant, in an action
to recover money as the assets of an insolvent bank,
tried to the court. Affirmed.

*Guy E. Kelly, Thomas MacMahon, F. D. Oakley,* and
*Robt. B. Abel,* for appellant.

*Bronson, Robinson & Jones,* for respondent.

FULLERTON, J.—This is an action by the state super-
visor of banking, as the officer in charge of the liquida-
tion of the Scandinavian American Bank of Tacoma,

[1]Reported in 221 Pac. 321.

to recover from the respondent, Dean Johnson, the sum of $31,250. As grounds for recovery, it is alleged in the complaint that Johnson, while vice-president and trustee of the bank named, fraudulently and in collusion with the president of the bank, and without consideration, took from the vaults of the bank the sum sought to be recovered. Issue was taken on the allegations of the complaint and a trial was had, which resulted in a judgment in favor of the respondent. The supervisor of banking appeals.

The facts, concerning which there is little or no dispute, are, in substance, these: In the early part of the year 1919, the respondent, Johnson, was a resident of the state of New York. He was then some twenty-five years of age and had just been discharged from army service. He did not have sufficient funds to establish a bank on his own account, but was desirous of investing such money as he did have in a banking business at some place on the Pacific coast, either by joining with others in the establishment of a new bank or by becoming connected with an established bank. He had heard of a Mr. Jafet Lindeberg, who was reputed to him to be wealthy, and also reputed to be connected with a number of banks severally located at places in the different coast states. He wrote to Mr. Lindeberg, at his address in San Francisco, stated to him his circumstances and his desires, and inquired as to the possibility of acquiring a connection with some one of the banks in which Mr. Lindeberg was interested. The Scandinavian American Bank of Tacoma had shortly theretofore increased its capital stock from four hundred thousand dollars to one million dollars, and some part of this stock was offered for sale to the general public at a premium of twenty-five dollars per share. Mr. Lindeberg answered the letter, informing the respondent of this fact, and telling him that the

president of the bank, Mr. O. L. Larson, would be in
New York at a certain time named and would per-
sonally consult with him concerning the matter. After-
wards Mr. Larson met the appellant in New York City,
at which meeting an agreement was entered into where-
by the respondent agreed to purchase two hundred
and fifty shares of the newly issued capital stock of
the Tacoma bank at a price of $31,250, and Mr. Larson
agreed that, in consideration of the purchase, he would
repurchase from the respondent the shares mentioned,
at the price the respondent paid for the same, should
the respondent thereafter become dissatisfied with his
purchase; the agreement to repurchase being made
to avoid the necessity of a personal investigation of
the situation on the part of the respondent. There-
after the respondent purchased the shares of stock,
paying for them in full in cash, and thereupon Mr.
Larson put in writing his agreement to repurchase the
stock.

It seems to have been the mutual understanding be-
tween the respondent and Mr. Larson that the respond-
ent should have a part in the conduct of the bank, and
he appeared at the bank to take up his duties in
January, 1920. He was then elected a vice-president
and a trustee of the bank. He was first assigned to the
duty of meeting the new customers of the bank, but
owing to the somewhat inadequate quarters in which
the business of the bank was conducted, his office
assignments were unsuitable for this purpose, and he
thereupon sought from Mr. Larson other employment
and was put upon outside work. He soon became dis-
satisfied with this work, as he felt that it did not bring
him in contact with that part of the bank's business in
which he desired to become efficient. He then announced
to Mr. Larson that he was dissatisfied with his pur-
chase, and asked that Mr. Larson make good his

promise to take the bank stock off his hands. This Mr. Larson did, giving him a cashier's check on the bank for the amount the respondent had paid therefor, and taking an assignment of the stock to himself. This transaction took place on November 13, 1920. The respondent placed the check for collection with a bank in San Francisco, California, and it was forwarded to the payor bank, and paid by it on November 18, 1920. Shortly thereafter the respondent severed his connection with the bank. For some few days following the delivery of the check, perhaps until the check was actually cashed, the bank's books were balanced by some form of counter-charge, not made very clear by the record. After the payment by the bank, the amount thereof was charged, at the direction of Mr. Larson, to the account of Jafet Lindeberg, who then had on deposit with the bank, according to the books of the bank, a checking account of upwards of $150,000. The bank was found to be insolvent in February, 1921, and was then taken in charge by the state supervisor of banking for liquidation.

Among the disputed questions of fact, is the right of Larson to direct the amount of the cashier's check to be charged to the account of Lindeberg. The negative of this proposition rests wholly on the testimony of Lindeberg. His testimony appears in the record by deposition taken at San Francisco, California. At the taking of the deposition, Lindeberg appeared with personal counsel. In answers to questions put to him by counsel for the supervisor of banking, he stated that Larson had no authority to make the charge and that he had not subsequently ratified it. On cross-examination, however, he refused, on the advice of his personal counsel, to answer pertinent questions concerning his personal business relations with Larson, and pertinent questions concerning the right of Larson

to check against his account, basing his refusal on the ground that his answers might tend to incriminate him. On the other side, it was shown that Larson had, over a long period of time, freely exercised the right to draw checks upon and direct charges to be made against the account. These in their total amounted to a large sum, and several of the individual items were in considerable amounts. There was also exhibited a power of attorney executed by Lindeberg and his wife to Larson and two others authorizing them jointly to transact the general business of the makers of the power of attorney in the state of Washington. It was shown also that Larson individually, usually, if not uniformly, exercised the power conferred, and there is no showing that Lindeberg ever questioned his authority so to do.

On the evidence as a whole, the trial court determined the fact against the contention of the supervisor, and we are not inclined to disagree with its conclusion. The deposition of Lindeberg was nothing more in effect than an *ex parte* statement, and is not worthy of the credence usually imparted to such statements. His refusal to answer carries with it the inference that his business relations with Larson and the bank were not only dishonest but criminal, and the inference that, if the facts were told, his personal liberty would be endangered. Assuredly, under circumstances such as these, a court of justice may be permitted to doubt the truthfulness of any of his statements.

The appellant further contends that the credit to Lindeberg's account as shown on the books of the bank was fictitious rather than real. This claim is founded on the fact that the bank then held Lindeberg's obligations for an amount possibly in excess of his checking

account. But the bank had not then attempted to exercise a right of set-off, even conceding it had such right. It then recognized the account as a checking account, and as long as it did so, Lindeberg or his authorized agent were privileged to draw checks thereon. What might have been the resulting conditions were the bank then insolvent or in imminent danger of insolvency, need not be discussed. There is no contention or evidence that it was so, nor is there any claim that the payment worked an unlawful preference under the bankruptcy act.

The appellant further argues that the transaction was void because it was a payment of the private debt of Larson from the funds of the bank. But this can be the effect of the payment only in case Larson was without authority to pay it out of the funds of Lindeberg on deposit with the bank. If he had such authority, the transaction does not differ from the ordinary transaction where a depositor with a bank draws a check upon his deposit account. It is true a cashier's check was issued to the respondent, but this is not such an unusual circumstance as to even excite suspicion, much less a circumstance which will avoid the transaction. It is but a form of check by which the bank lends its credit to the purchaser of the check, the purpose being to make it available for immediate use in banking circles. Nor is it a circumstance sufficient to avoid the check that the amount thereof was not immediately charged to Lindeberg's account. What may have been the reason for the delay is not shown, but clearly it is not a circumstance from which fraud sufficient to avoid the entire transaction can be presumed. There was no attempt to prove by direct evidence the charges of fraud contained in the complaint. Nothing but the naked facts and their attending cir-

cumstances were shown, and these, we conclude, do not warrant disturbing the judgment of the trial court.

The judgment is affirmed.

MAIN, C. J., BRIDGES, and MITCHELL, JJ., concur.