[No. 11782–3–I.  Division One.  August 13, 1984.]

FREDRICK W. CRUNK, ET AL, *Respondents,* v. STATE
FARM FIRE AND CASUALTY COMPANY, *Appellant.*

*Julin, Fosso & Sage, James D. McBride II,* and *George A. Trichak,* for appellant.

*Baker, Lane & Rothschild* and *John Rothschild,* for respondents.

DURHAM, C.J.—Appellant State Farm Fire and Casualty Company (State Farm) appeals from an order granting summary judgment to respondents Fredrick and Alice Crunk in connection with their action seeking reimbursement pursuant to their homeowner's insurance policy with State Farm.

On March 31, 1981, Fredrick and Alice Crunk retained George K. Wright, d/b/a G & G Construction, for a $36,000 remodeling job on their residence. The Crunks arranged the necessary financing with Peoples Bank, and obtained a cashier's check in the amount of $18,884.91 payable to Fredrick Crunk and G & G Construction. The check was to be used as the initial installment on the contract price. On July 8, 1981, Fredrick Crunk endorsed the cashier's check and gave it to Wright as the initial payment on the contract. When Wright failed to begin work on the house, the Crunks discovered that he had left the state. The Crunks notified the police, and a warrant was issued for Wright's arrest. Wright was apprehended in Florida and brought back to Washington, where he pleaded guilty to three counts of first degree theft.

At all times pertinent the Crunks maintained a home-owner's policy with appellant State Farm. The Crunks filed a claim for $18,884.91 under the theft provisions of the policy, but State Farm denied coverage. The policy covered risk of loss of unscheduled personal property due to theft, which was defined to mean "any act of stealing or attempt thereat". State Farm's offer to settle the claim for $100 apparently was rejected, as the Crunks brought an action against State Farm based upon its denial of coverage. Cross motions for summary judgment were filed and the court granted the Crunks' motion and denied State Farm's. State Farm's motion for reconsideration was also denied, and this appeal followed.

State Farm first argues that even though Wright was convicted of theft, the acts which gave rise to his conviction do not fall within the meaning of the term theft as it is used in the policy. In so doing, State Farm relies upon Wright's guilty plea, which states:

> From November, 1980 and July, 1981, I was working as a building contractor. I had several jobs: Felhauser, Crunk, Pearsons & Persons. I got behind in the Felhauser job and then everything snowballed. I tried to catch up and I couldn't. I used money from one job for another job in hopes of catching up. I used money advanced to me by the Crunks and Persons for purposes other than the work I was hired to do and never started their work.

State Farm points out that Wright was charged pursuant to RCW 9A.56.020(1)(b), which requires that the defendant obtain control over the property or services of another by color or aid of deception with the intent to deprive him of such property or services.[1] According to State Farm, the plea statement indicates that Wright intended to perform his duties under the contract at the time he received the cashier's check, and, therefore, could not be guilty of theft

---

[1]RCW 9A.56.020 provides in relevant part:

"(1) 'Theft' means: . . .

"(b) By color or aid of deception to obtain control over the property or services of another or the value thereof, with intent to deprive him of such property or services; . . ."

by deception. State Farm apparently does not dispute that Wright *at some point* formed the intent to misappropriate the cashier's check. Thus, State Farm's argument amounts to an assertion that the term theft was not intended to apply to embezzlement. We disagree.

Language in an insurance contract must be interpreted as it would be understood by an average person purchasing insurance, and not in a technical sense. *Shotwell v. Transamerica Title Ins. Co.*, 91 Wn.2d 161, 168, 588 P.2d 208 (1978); *Nationwide Mut. Ins. Co. v. Kelleher*, 22 Wn. App. 712, 715, 591 P.2d 859 (1979). The court will construe an inclusionary clause liberally to provide coverage whenever possible. *Pierce v. Aetna Cas. & Sur. Co.*, 29 Wn. App. 32, 36, 627 P.2d 152 (1981). If a policy provision is ambiguous, the court must apply the meaning and construction most favorable to the insured, even though the insurer may have intended another meaning. *Herrmann v. Grange Ins. Ass'n*, 33 Wn. App. 734, 736, 657 P.2d 346 (1983).

Courts in other jurisdictions, applying essentially the same rules of construction, have generally concluded that where terms such as "theft" or "larceny" are used in an insurance policy, they should be interpreted broadly to include any unauthorized misappropriation of the insured's property. *See, e.g., Almadova v. State Farm Mut. Auto. Ins. Co.*, 133 Ariz. 81, 649 P.2d 284 (1982); *Steinbach v. Continental W. Ins. Co.*, 237 N.W.2d 780 (Iowa 1976); *Farm Bur. Mut. Ins. Co. v. Carr*, 215 Kan. 591, 528 P.2d 134 (1974); *Modern Sounds & Sys., Inc. v. Federated Mut. Ins. Co.*, 200 Neb. 46, 262 N.W.2d 183 (1978); *Rudolph v. Home Indem. Co.*, 138 N.J. Super. 125, 350 A.2d 285 (1975); *Katze v. Randolph & Scott Mut. Fire Ins. Co.*, 111 Wis. 2d 326, 330 N.W.2d 232 (Ct. App. 1983), *rev'd on other grounds*, 116 Wis. 2d 206, 341 N.W.2d 689 (1984).

In general, these cases involved an insured who was fraudulently induced to sell an item of personal property in exchange for a bad check. Typically, the insurance company argued that the terms "theft" or "larceny" were intended to

encompass only common law larceny. At common law, it was held that the fraudulent procurement of possession gave rise to larceny (larceny by trick), whereas the fraudulent procurement of title constituted the separate crime of "false pretenses." *See* W. LaFave & A. Scott, *Criminal Law* § 90 (1972).[2] Accordingly, the insurer argued that the policy did not encompass a situation in which the insured is fraudulently induced to part with title, as opposed to mere possession. The modern trend, exhibited in these cases, has been to reject the view that the parties to an insurance contract contemplate such esoteric distinctions, unless they are clearly spelled out in the policy. For example, in *Almadova,* the court held that:

> [W]here the terms "theft" or "larceny" are used in the grant of coverage in an . . . insurance policy, but are not clearly defined or limited, they are ambiguous and should be interpreted broadly to include a loss caused by *any unlawful or wrongful taking . . . with criminal intent, whether or not such taking technically qualifies as embezzlement, theft or larceny at common law.*

(Italics ours.) *Almadova,* at 84. *See also Firemans Fund Ins. Co. v. Boyd,* 45 So. 2d 499 (Fla. 1950); *Gomez v. Security Ins. Co.,* 314 So. 2d 747 (La. Ct. App. 1975); *World Inv. Co. v. Manchester Ins. & Indem. Co.,* 380 S.W.2d 487 (Mo. Ct. App. 1964); *Munchick v. Fidelity & Cas. Co.,* 2 Ohio St. 2d 303, 209 N.E.2d 167, 169–70 (1965); *Rainey v. Northwestern Nat'l Cas. Co.,* 44 Or. App. 43, 605 P.2d 294 (1980). *See generally* Annot., 48 A.L.R.2d 8 (1956).

State Farm, however, argues that such a construction is foreclosed because the term theft is defined in the policy. Again, we disagree. The Crunks' policy defines theft to mean "any act of stealing or attempt thereat". This definition sheds little light on the parties' intent. It certainly does not suggest that the parties contemplated any distinc-

---

[2]This distinction was based upon the fact that larceny required some sort of trespass. *See* W. LaFave & A. Scott, *Criminal Law* § 84 (1972).

tion between theft and embezzlement.[3] Because the term "theft" is "fairly susceptible to two different interpretations, both of which are reasonable", *Morgan v. Prudential Ins. Co. of Am.,* 86 Wn.2d 432, 435, 545 P.2d 1193 (1976), it is ambiguous. We are, therefore, required to apply the construction most favorable to the insured. *Morgan,* 86 Wn.2d at 435; *Herrmann,* 33 Wn. App. at 736.

For the same reason that the average policyholder would not likely recognize the distinction between larceny by trick and false pretenses, it is unreasonable to assume that the average policyholder would believe that no theft occurs simply because the defendant forms the intent to deprive after the transfer has occurred. State Farm was in the best position to make the policy clear, *see Munchick,* 209 N.E.2d at 169–70, and could have included a provision specifically excluding embezzlement. *See Carr,* 528 P.2d at 138–39. Accordingly, we hold that the terms "theft" or "larceny," when left undefined, should be interpreted to include any wrongful deprivation of the property of another without lawful authority.[4]

State Farm next contends that even if a theft occurred, the policy limits coverage to either $100 or $500. The Crunks' policy contains a provision entitled "Special Limits of Liability", which provides in part:

Under coverage B, this company shall not be liable for loss in any one occurrence with respect to the following property for more than:
(1) $100 in the aggregate on *money,* bullion, numismatic property and *bank notes*; (2) $500 in the aggregate on securities, accounts, bills, deeds, *evidences*

---

[3]Black's Law Dictionary 1583–84 (4th rev. ed. 1968) alternatively defines the term "steal" to mean "theft, that is, the felonious taking and carrying away of the personal property of another" or "the criminal taking of personal property either by larceny, *embezzlement,* or false pretenses." (Italics ours.)

[4]Our holding is buttressed by the fact that the Legislature has obliterated the distinctions between larceny, false pretenses, and embezzlement. Under the Washington statute, these crimes are treated as separate methods of committing the general crime of theft. *See* RCW 9A.56.020.

*of debt,* letters of credit, *notes other than bank notes,*
. . .

(Italics ours.)

State Farm first argues that a cashier's check is "money" as that term is used in the policy because a cashier's check functions as a medium of exchange. Thus, State Farm urges us to adopt a functional definition of money, relying on *De Biase v. Commercial Union Ins. Co.,* 53 Misc. 2d 45, 278 N.Y.S.2d 145, *aff'd,* 55 Misc. 2d 676, 286 N.Y.S.2d 502 (1967). In *De Biase,* the court held that a rare coin collection was not money for purposes of a limitation of liability similar to the one at issue here. The court reasoned that because money is any matter which is used as a medium of exchange, the coin collection was not money because it had value to the owner primarily as an article of commerce, and not as currency.

It is true that cashier's checks possess many of the characteristics associated with money. A cashier's check has been defined as "a bill of exchange or draft drawn by a bank upon itself, and is . . . accepted by the act of issuance." H. Bailey, *Brady on Bank Checks* § 1.11, at 1–16 (5th ed. 1979). *Accord, Scott v. Seaboard Sec. Co.,* 143 Wash. 514, 517, 255 P. 660 (1927). A cashier's check is a promissory note of the issuing bank, and, as such, represents the unconditional obligation of the bank to pay the amount of the check to the payee upon presentment. *Scott v. Seaboard Sec. Co., supra;* H. Bailey, at § 1.11; 10 Am. Jur. 2d *Banks* § 544 (1963). In addition, it has been held that payment cannot be stopped on a cashier's check. *Kohler v. First Nat'l Bank,* 157 Wash. 417, 422, 289 P. 47 (1930). Because of these characteristics, cashier's checks have been described as the equivalent of the money that they represent. *See Scott,* at 518; 10 Am. Jur. 2d at 519. *But see Deones v. Zeches,* 212 Minn. 260, 3 N.W.2d 432, 433 (1942).

It does not follow, however, that a cashier's check is "money" for purposes of this insurance policy. If an ambiguity exists, exceptions and limitations in insurance

contracts, unlike inclusionary clauses, should be interpreted narrowly to afford coverage whenever possible. *Phil Schroeder, Inc. v. Royal Globe Ins. Co.,* 99 Wn.2d 65, 68, 659 P.2d 509 (1983); *United Pac. Ins. Co. v. Van's Westlake Union, Inc.,* 34 Wn. App. 708, 712, 664 P.2d 1262 (1983). An ambiguity exists when there is a difference of opinion among courts of different jurisdictions with respect to the construction of terms in insurance policies. *See* Annot., 4 A.L.R.4th 1253 (1981). Although the *De Biase* court adopted a functional definition of money, the court in *McKee v. State Farm Fire & Cas. Co.,* 145 Cal. App. 3d 772, 193 Cal. Rptr. 745 (1983) expressly rejected that approach. In *McKee,* the insured argued that a collection of rare American currency did not constitute money within the meaning of a policy exclusion identical to the one at issue here. The court rejected the argument that the coins ceased being money simply because the plaintiff had withdrawn them from circulation. In so doing, the court rejected the functional test urged by State Farm, stating that it is "infinitely more reasonable to presume that words descriptive of property ordinarily have reference to kind, rather than use." *McKee,* 193 Cal. Rptr. at 747.

Because the term "money" is ambiguous, we are compelled to construe the exclusionary clause strictly against the insurer. Accordingly, we hold that the cashier's check is not money as that term is used in the limitation of liability provision.

State Farm next argues that if the cashier's check is not money, it is a bank note. Again, we disagree. Bank notes are the promissory notes of a bank to pay to the bearer a sum certain on demand. However, unlike ordinary promissory notes, they are intended to pass as money or currency for an indefinite period. *See Bank of United States v. Bank of Ga.,* 23 U.S. (10 Wheat.) 333, 347, 6 L. Ed. 334 (1825); 10 Am. Jur. 2d *Banks* § 320 (1963); 54 Am. Jur. 2d *Money* § 12 (1971). Thus, the term "bank note" is virtually a term of art. Even if we were to construe the limitation of liability against the insured, we do not see how a cashier's check

could be classified as a bank note.[5]

■ Finally, State Farm argues that if the cashier's checks are not money or a bank note, then they must be either "evidences of debt" or "notes other than bank notes" for purposes of the $500 limitation of liability. We cannot consider this argument. An appellate court does not review theories other than those which were presented to the trial court. *See Barnes v. Seattle Sch. Dist. 1,* 88 Wn.2d 483, 489, 563 P.2d 199 (1977); *McCord v. Tielsch,* 14 Wn. App. 564, 568, 544 P.2d 56 (1975).

The order granting summary judgment is affirmed.

CORBETT, J., concurs.

Reconsideration denied September 10, 1984.

Review granted by Supreme Court December 19, 1984.

---

[5]The fact that the limitation of liability provision expressly distinguishes bank notes from money lends support to our earlier conclusion that cashier's checks do not constitute money within the meaning of the provision. If anything, bank notes have more of the characteristics of legal tender than do cashier's checks; indeed, they are specifically *intended* to pass as currency. Nonetheless, the policy treats bank notes separately from money. If State Farm had intended that cashier's checks would constitute money simply because the two share certain functional characteristics, there would have been no need to list bank notes separately.